## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No. 25-cr-134 (RC)** |
| | ) | |
| **RYAN RILEY ENGLISH** | ) | |
| | ) | |

### <u>MOTION FOR RELEASE</u>

Riley English respectfully requests that the Court schedule a detention hearing and order release based on new circumstances. For the reasons stated below and for the reasons already stated in ECF No. 7 (Defense Original Motion for Release), the Bail Reform Act requires release.

## **Procedural History**

On January 28, 2025, Ms. English was arrested after alerting law enforcement at the U.S. Capitol Building that she had items in her pocket that she believed could be used as Molotov cocktails and that she wished to turn herself in. The government initially charged her with receiving, possessing, or transferring a firearm, under 26 U.S.C. § 5861 or, carrying or discharging a firearm, dangerous weapon, explosive or incendiary device, under 40 U.S.C. § 5104(e)(1)(A). *See* ECF No. 1.

After Ms. English turned herself in and essentially asked to be arrested, and while in a diminished mental state, she told law enforcement every single random thought that was going through her unsound mind spanning months before she left her home in Massachusetts to the second she turned herself in.

At a detention hearing on January 30, 2025, Ms. English conceded detention[1] with the hope of continuing to cooperate with the government and to resolve her case expeditiously in a favorable manner. In accordance with this desire, Ms. English consented to tolling time under the Speedy Trial Act and waiving a timely preliminary hearing, agreeing to schedule her next hearing on May 12, 2025. The magistrate court acknowledged that Ms. English reserved her right to address detention at a later time if there were to be a change in circumstances.

The parties were unable to resolve this matter and the government obtained an indictment charging Ms. English with Attempt to Assassinate a Cabinet Member

---

[1] Ms. English waived any findings of fact.

Nominee and Carrying a Firearm, Explosive, Or Incendiary Device on the Grounds of the Capitol. *See* ECF No. 16.

The parties then appeared for an arraignment before this Court on May 28, 2025, where Ms. English again consented to tolling time under the Speedy Trial Act and the next status conference was scheduled for July 31, 2025.

In the meantime, Ms. English has been detained at the Correctional Treatment Facility (CTF), where she has received mental health counseling and medical treatment. Her state of mind has improved significantly.

Lastly, Ms. English now has a release plan and proposed conditions that would ameliorate any concern that she would not appear for future hearings or be a danger to the community.

## <u>LEGAL AUTHORITY</u>

While the Rules of Criminal Procedure do not explicitly provide for motions to reconsider, such motions are properly entertained in criminal cases. *See, e.g., U.S. v Sunia*, 643 F. Supp 2d 51, 60 (D.D.C. 2009), *U.S. v Slough*, No. CR 08-360 (RCL), 2014 WL 3734139, *2 (D.D.C. July 29, 2014), *U.S. v Cabrera*, 699 F. Supp. 35, 40 (D. D.C. 2010).  In deciding motions for reconsideration in criminal cases, the courts apply the same standard applicable in civil cases under F. R. Civ. P 59(e). *U.S. v Sunia*, 643 F. Supp 2d at 60 and *U.S. v Slough*, 2014 WL 3734139 at *2, and look at whether justice requires reconsideration.  As the Court articulated in *Slough* at *2, "asking 'what justice requires' amounts to determining, within the Court's discretion, whether reconsideration is necessary under the relevant circumstances,"

citing *Cobell v. Norton*, 355 F. Supp. 2d 531, 539 (D.D.C. 2005). "Moreover, "[e]ven if the appropriate legal standard does not indicate that reconsideration is warranted, the Court may nevertheless elect to grant a motion for reconsideration if there are other good reasons for doing so." *Sunia* at 61, citing *Isse v American Univ.*, 544 F. Supp. 2d 25, 29 (D.D.C. 2008). Moreover, in the context of the Bail Reform Act, it is sufficient to show that there is "information that was not known to the movant at the time of the hearing and that has a material bearing" on the detention question. *United States v. Lee*, 451 F. Supp. 3d 1, 5 (D.D.C. 2020).

The Bail Reform Act requires courts to release defendants who are pending trial on personal recognizance or on an unsecured appearance bond unless the government has presented clear and convincing evidence that there are no conditions that will "reasonably assure the appearance of the person as required or . . . the safety of any other person or the community." 18 U.S.C. §§ 3142(b), 3142(f)(2)(B). In other words, "the default position of the law . . . is that a defendant should be release pending trial." *United States v. Taylor*, 289 F. Supp. 3d 55, 62 (D.D.C. 2018) (quoting *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010)).

Defendants who are charged with certain specified offenses are subject to a rebuttable presumption that no condition, or combination of conditions, can assure the defendant's appearance or ensure the safety of the community, *see* 18 U.S.C. § 3142(e). Even if such a presumption exists, the defense only has to meet a burden of production and the burden of persuasion remains with the government throughout

the proceeding. *United States v. Taylor*, 289 F.Supp.3d 55, 63 (D.D.C. 2018) (emphasis added) (citing *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)).

In determining whether the government has defeated the burden of persuasion by clear and convincing evidence proving that no combination of conditions can protect a person or the community, or by a preponderance of evidence that no combination of conditions can assure the defendant's appearance, courts consider four factors: (1) the nature and seriousness of the offense charged; (2) the weight of the evidence; (3) the defendant's character, including his physical and mental condition, family and community ties, past conduct, drug and alcohol abuse, and criminal history; and (4) the nature and seriousness of the danger posed to any person by release.  18 U.S.C. § 3142(g).

## Argument

### I.    <u>Nature and Circumstances</u>

After reviewing additional discovery, it is even more clear that Ms. English's alleged actions were a severe cry for help and done under a significantly diminished mental state. A review of Capitol Building surveillance revealed that Ms. English was pacing back and forth in and around the Capitol building for almost two hours before ultimately approaching a Capitol police officer to tell them that there were "Molotov cocktails" and a small army knife on her person.

During a multiple hour interview with law enforcement, Ms. English gave a long statement where she shared conflicting, incoherent, and random thoughts that

she had the previous several months. Ms. English described her mental state in detail sharing her desperation after the suicide of her fiancé not too long ago. Ms. English's statements were inconsistent, sharing her alleged intention to hurt members of Congress but then minutes later saying she really had no plans at all. Her statements were not of that of an individual with sound mind – rather she rambled conflicting thoughts that had no basis in reality. Ultimately, the theme of her statements were that she did not want to hurt anyone and that she did not think that was what she was supposed to do but that she wanted to do "something" implying her actions were more of a cry for help or an unorganized act of protest.

Her inconsistent and rambling words matched her behavior at the Capitol building where she had two small alcohol bottles that were closed and were wrapped in cloth drenched in hand sanitizer. These items would never have caused damage, and in fact the police that detained her noted they were not Molotov cocktails. Ms. English had, on her person, these two "cocktails" while walking back and forth not really having a plan and again, not in a good mental state. On this video surveillance, Ms. English is seen walking to places that did not have members of Congress as she clearly did not know where she was going. Then, she walked up to a Capitol police officer and calmly told them what was going through her head. Notably, Ms. English was not brandishing the "Molotov cocktails" or the army knife – rather she had to direct law enforcement to where they were located on her person. She did not and would never have hurt another person. Taken all together, these were the actions and

words of a person who needed help and who was desperate to find a grip on her instability.

The government, in its memorandum in support of pre-trial detention (ECF No. 8) contends that she only decided not to "take action" because she saw how difficult it would be to execute her plan. That conclusion wildly ignores that if that was the case, she would have just returned to her car and left and went home. At that point, she was not a subject of interest and not on the radar of law enforcement. It was only until Ms. English approached law enforcement and was brutally honest about what was going on that she was arrested and now charged with very serious offenses. Her actions show us that the only plausible reason for her turning herself in was because she felt regret for her actions and because she desperately needed help.

## II.   **History and Characteristics**

Ms. English just turned 25 years old and does not have a criminal history and certainly does not have a history of violence. She grew up in Massachusetts with two other siblings, one her twin, and two parents who are still married and still reside in the same home they have lived in for 30 years.

Prior to her arrest, Ms. English was employed at a pizza parlor and was renting a room in an apartment with a roommate. She was also being treated for a severe heart condition that led to her having a pacemaker, which she still has. Records from Boston Children's Hospital reveal that Ms. English has constant follow up

appointments to monitor her condition and to ensure her pacemaker is working properly. While incarcerated, she has missed those appointments. Thankfully, Ms. English has been treated while at CTF and is stable condition. However, she has many future scheduled appointments at Boston Children's with her longstanding cardiologist who is the most familiar with her condition.

### III.    **Release Plan**

Recognizing that Ms. English needs help and has been stable with treatment and assistance, she proposes the following conditions of release:

1. Reside in the care of appropriate third-party custodians in Massachusetts – her parents.
2. Be subject to location monitoring.
3. Home detention with the exception of attending medical and mental health appointments.
4. Mental health evaluation/counseling/treatment.

Ms. English's parents reside in East Taunton, Massachusetts in a stable residential family home. They are both willing to serve as third party custodians and share the responsibilities of serving this role.[2]

---

[2] In ECF No. 7, counsel represented that the relationship between Ms. English and her parents was strained. Since her being incarcerated, she has been in regular contact with her parents and counsel has directly spoken with her parents, who wish to host their child in in their home during this difficult time.

Prior to Ms. English's arrest, she was employed – however it is doubtful she will still be employed at the same place if she is released. First and foremost, before searching for new employment, Ms. English proposes that she continue being treated by a mental health professional. At CTF, she has been meeting with a counselor who has already helped to bring her to a place of mental stability. Given Ms. English's alleged actions and thoughts, she needs continued treatment and recognizes how important that will be to her future. Lastly, location monitoring will assure the Court that probation is aware of her location at all times to ameliorate any further concern regarding danger to the community.

For all of these reasons, Ms. English respectfully requests that she permitted to reside with her parents while being supervised by pre-trial services and under the care of third party custodians.

## IV. <u>Weight of the Evidence</u>

The government will likely not be able to prove beyond a reasonable doubt that Ms. English had the specific intent to kill a member of Congress and so this factor weighs in favor of release. Not only was Ms. English suffering from a diminished mental state, but she also did not take a substantial step in carrying out an unrealistic plan to kill a Congress member. In fact, she took a substantial step in the other direction – she alerted law enforcement and turned herself in.

Notably, the same case the government uses in support of its arguments discusses how the weight of the evidence should be equally weighed "in accordance of

the evidence against a defendant." *U.S. v. Blackson*, 2023 WL 1778194 at *10. In a unique case such as this one where the weight of the evidence is notably weak, this factor can outweigh other factors in support of release the same way that the history and characteristics of a defendant can outweigh other factors in support of release or detention.

## V.     Additional Comparison Case

Counsel provided a few cases where past defendants were released in similar and more aggravating circumstances (ECF No. 7) and has identified one more case where the Court recently ordered the release of an individual charged with attempted arson and attempting to damage property used by foreign government. In *United States v. Benjamin Grabinkski*, 1:25-cr-0019 (RJL), the magistrate court ordered the release of Mr. Grabinski who is accused of throwing a "firebomb" at the Chinese embassy that did not work and were not likely to succeed.[3] To distinguish, however, Mr. Grabinski's conduct dated back to 2022 and since then he has undergone competency proceedings. Nonetheless, a magistrate court agreed that conditions of release could be fashioned to protect the community and assure his appearance in a case that had an undisputable presumption for detention. Like Mr. Grabinski, Ms. English's actions were more like an attempt to express dissatisfaction with the government rather than a real effort to hurt anyone. Also, like Mr. Grabinski, Ms.

---

[3] The government appealed this order and Judge Leon granted the appeal and reversed the magistrate court's decision to release Mr. Grabinski basing its decision mostly on the defendant's history of threatening the Chinese Embassy. *See* Memorandum Opinion ECF No. 16.

English's diminished mental state played a large role in her statements and her actions.

Respectfully Submitted,

A. J. KRAMER

Federal Public Defender for the
District of Columbia

*/s/ Maria Jacob*
Maria Jacob
Assistant Federal Public Defender
625 Indiana Avenue, NW
Washington D.C. 20004
202 208-7500