## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**RYAN MICHAEL ENGLISH,**<br>also known as, "Reily" Michael English,<br><br>**Defendant.** | **Case No. 25-CR-00134 (RC)** |

## STATEMENT OF OFFENSE IN SUPPORT OF GUILTY PLEA

### I.    SUMMARY OF THE PLEA AGREEMENT

Defendant English agrees to admit guilt and enter a plea of guilty to both counts in the Superseding Information: Count One - Unlawful Receipt, Possession, and/or Transfer of a Firearm, in violation of 26 U.S.C. § 5861(d); and Count Two - Carrying a Firearm, Dangerous Weapon, Explosive, or Incendiary Device on the Grounds of the U.S. Capitol, in violation of 40 U.S.C. § 5104(e)(1)(A).

### II.    ELEMENTS OF THE OFFENSES

Count One

The essential elements of the offense of Unlawful Receipt, Possession, and/or Transfer of a Firearm, in violation of 26 U.S.C. § 5861(d), each of which the Government must prove beyond a reasonable doubt are:

1. The defendant possessed a certain type of firearm, that is, a destructive device;

2. The defendant did so voluntarily and on purpose, and not by mistake or accident;

3. This destructive device has not been registered to the defendant in the National Firearms Registration and Transfer Record; and

4. The defendant knew that the firearm possessed was an incendiary bomb or similar device, and was designed for use as a weapon.

Count Two

The essential elements of the offense of Unlawful Possession of a Firearm on Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(1)(A)(i), each of which the Government must prove beyond a reasonable doubt are:

1. The defendant knowingly entered the Capitol Grounds or any of the Capitol Buildings; and

2. While the defendant was on the Capitol Grounds or any of the Capitol Buildings, the defendant knowingly carried or had readily accessible a dangerous weapon.

## II.    PENALTIES FOR THE OFFENSES

Count One

The penalty for the offense of Unlawful Receipt, Possession, and/or Transfer of a Firearm, in violation of 26 U.S.C. § 5861(d), is as follows:

1. A maximum term of imprisonment of not more than ten years;

2. A fine of not more than $10,000;

3. A term of supervised release of not more than three years, after any period of incarceration; and

4. A special assessment of $100.

Count Two

The penalty for the offense of Unlawful Possession of a Firearm on Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(1)(A)(i), is as follows:

1.    A maximum term of imprisonment not greater than 5 years;

2.    A fine not to exceed $250,000;

3.    A term of supervised release of not more than three years, after any period of incarceration; and

4.    A special assessment of $100.

## III.   STATEMENT OF FACTS

On January 27, 2025, the United States Senate was scheduled to vote on whether to confirm the nomination of Scott Bessent as the United States Secretary of the Treasury.

At approximately 3:12 p.m. that day, outside of 1 First Street, Northwest, Washington, DC, near the South Door of the U.S. Capitol Building, the defendant, Ryan Michael English a/k/a Raleigh Jane English,[1] approached a United States Capitol Police Officer and stated, "I'd like to turn myself in." The Defendant further stated that the Defendant was in possession of a knife and what the Defendant referred to as two "Molotov Cocktails." A "Molotov cocktail" is the common term for what is a destructive device or incendiary bomb.

The Defendant was detained and searched by United States Capitol Police officers. While being searched, the Defendant stated, "I've got a knife in my pocket, and Molotovs in my jacket." The search of the Defendant uncovered a folding knife with a 3.5-inch blade in the Defendant's front right pants' pocket, as well as two destructive devices from the inside pockets of the Defendant's jacket. The destructive devices were constructed of 50 milliliter bottles of Absolut brand vodka with a grey cloth affixed to each bottle's top. The grey cloth had been soaked in an alcohol-based hand sanitizer. A green BIC brand lighter was also recovered from the Defendant's pants' pocket. While being searched, the Defendant stated that the bottles contained "Vodka, hand sanitizer on the rag, and a lighter." When asked, "Is that really a Molotov cocktail?", the Defendant

---

[1]    The defendant was originally charged as Ryan Michael English a/k/a "Reily" Michael English.  The defendant has since reported a true name of Raleigh Jane English.

responded, "Well, it works." Shortly thereafter, the Defendant was asked the following questions and gave the following responses:

Q. What are you doing here today?

A. I was going to kill Scott Bessent.

Q. Kill Scott Bessent?

A. Yes, sir.

When asked whether the Defendant had anything additional in the Defendant's vehicle, the Defendant advised that there was a "big bottle of vodka" in the Defendant's vehicle.

The Defendant advised law enforcement of the location of the Defendant's car, which was located in the 900 Block of Independence Ave Southwest, Washington, D.C. A law enforcement officer asked whether the Defendant left anything on the ground when walking from the car to the U.S. Capitol. The Defendant responded, "No, I don't want to hurt anyone . . . I don't want to hurt people. That's why I turned myself in." Law enforcement officers searched the Defendant's car for additional destructive devices. The search uncovered a 750-milliliter bottle of Smirnoff 100 proof vodka and a grey sweatshirt with cloth cut from the sleeves. The cloth of this sweatshirt was consistent with the cloth affixed to the destructive devices found on the Defendant's person.

During a search of the Defendant's person prior to transport, law enforcement officers recovered a receipt in the Defendant's back left pants' pocket. On the back of the receipt was written: "Judith dear god I am so sorry. You must understand I can feel myself dying slowly b/c of my heart. This is terrible but I cant do nothing while nazis kill my sisters. I love you. This is awful. Im so sorry. I love u. Please stay alive and heal. you can. you are strong enough. Fuck them for pushing us so far. you dont deserve this. Im so sorry for lying and plotting and lying. Please survive [drawings of 7 hearts]".

In addition, the words "NO FUTURE NO CHOICE" were hand-written on the Defendant's arm. When asked why the Defendant was in Washington, D.C., the Defendant told officers, "pretty much the words on my arms say everything."

During an interview with law enforcement officers later that day, the Defendant waived *Miranda* warnings and agreed to answer questions. During the interview, the Defendant made the following statements, in sum and substance, to law enforcement:

- "I'd been thinking about this for a while, not this specifically I'd just been thinking about doing good and being good."
- "I didn't have a plan in my mind. I felt like I had to do this. I felt like I was on a mission . . . Maybe I told myself to have faith and just see where this goes and I had been thinking about for this for a while because of Luigi Mangione. I have seen the response to that and that situation . . . It was not an everyday thing and it extremely shook up everything. I pushed that away because I was thinking like that is so stupid, that accomplishes nothing, that poor kid just threw his life away for like a minute of vengeance. Vengeance is bullshit, no one feels good about that. I cannot see an average, ordinary person hurting someone else and feeling good about it and I know that's extremely naive, especially how he did it. It's some guy he never met before, he shot him in the back of the head - you can't feel proud about that. He's probably questioning his humanity every single day. But as time goes on and as time went on, I started to understand things differently in my own personal situation, not regarding Luigi, regarding mainly the foremost thing is time—the feeling of running out of time, but of holy shit it's me . . . I don't think I'm the Messiah or anything . . . It's fate, it's destiny, it's whatever you want to call it."
- "When you ask me what my plans were today, I really did not have any."
- "The thought of violence didn't occur to me until fairly recently and the thought of 'Holy shit it's me, it's my role unfortunately' not that there is a role and then it's me it's that I have a role and unfortunately it's violence. That's very important, it's the other way around."
- "I was planning on burning down [a Washington, D.C.-based think tank], which is near the White House. I was planning on getting there, asking and pretending . . . I was going to go there under the guise of I applied for an internship . . . I was going to go to the [think tank], tell them what they wanted to hear, and basically say that I was, 'oh I was emailing with [Individual-1] for a while, oh it must have been a scam, oh that's so unfortunate' and introduce myself. . . I was just thinking of ways to meet [Individual-1], so I could kill [Individual-1] with . . . I was going to just slit [Individual-1's] throat because it was for revenge . . . I

was going to go and do that, and if not that I was planning on burning down the building."

- "I was making all of these plans in my head of what I could do. If all else fails, I was going to slit my wrists on the White House steps. Just because that's all you can do if you can't hurt anyone else and you're out of options and you're out of time and you need to have an outlet and you need to show people how serious it is and you need to make one big dramatic fucking thing."

- "So, that's what I was going to do. I was gonna hurt big players. I really had such faith, that I was expecting to bump into someone who I would recognize and go for it. I was thinking, Trump's in LA right now for the fires, maybe I'll catch him on the way back, ram my car into him and just drive my knife into him and then just die in the process."

- "My thoughts and you know whatever, super incriminating stuff, SCOTUS, the Senate, running into Trump, and also like if all else were to fail, I could stake it out and just kind of like stay there like in the area and figure out what I wanted to do, whether it took days or weeks because I was kind of stuck there at that point."

- "So, I get lost looking for libraries and I'm starting to freak out because I'm like. 'holy shit now I'm in Washington without a plan whatsoever' because I can't find a library. I didn't bring my phone with me because of the surveillance . . . I was thinking, 'okay, I have no plan, what the fuck am I going to do?' I get down there, and I can't just ask a stranger to start looking for targets, like that's ridiculous, that's stupid . . . . As I'm starting to lose faith, I see a library, Chevy Chase Library."

- "I get in the library and I start searching for stuff, it's like 1:00 maybe, 12:30/1:00 o'clock, and I see the news that Scott Bessent, who was a person I had in my mind in the past, in the recent past . . . . He's the new pick for, I don't know if he's even um sworn in, if like they voted, they're voting, they were voting for him today. I don't know . . ." [U.S. Capitol Police Special Agent asks, "Oh, the confirmation thing? For what, do you know"] "Treasury. Yup, he was going, but, I saw on Reddit without wanting this stuff . . . . on the popular page it shows you some things here and there, and I would kind of like lowkey look through that stuff looking for stuff to come to me so that way it wasn't suspicious at all and I could kinda of stay in the know without appearing so politically inclined or whatever. There was this, Scott Bessent, I believe he's a billionaire . . . . "

- "Scott Bessent is, I think he got sworn in, I don't know. He's the, uh, Secretary of Treasury. That Reddit post that I was talking to you about was him being directly asked . . . . 'Do you think that the federal minimum wage should be increased from $7.25?' And he said without hesitation... 'No' and he said it with a smile on his face and that got under my skin . . . . and this is how I decide who deserves to live or die right? Because I don't get to make that decision, but it's as if they're making it for themself."

- "I was really going to just hope to find them down there and when I get to the library and I see Scott Bessent and I'm like 'holy shit that's happening right now I can get down there within 30 minutes.' I looked at the other previous . . . . voting sessions, and I was like 'oh these things take hours I have plenty of time.' And, when I got there, I realized that, this is what it is . . . . He [Bessent] is just as deserving as the other people . . . . "

- "I turned myself in because, when I got there, I realized that I had already made myself too suspicious with the big coat and the behavior and the carrying, literally talking to an obituary, and kissing it. I could tell, I'm not stupid they're keeping their eye on me. I saw the Hill keeping his eye on me. I walked around the place, I tried to look into where the construction was being done, I was like 'maybe I can get in there.' I came to the realization . . . they have three people at every single entrance, there are other people that I don't know, they're strangers, therefore they're innocents or whatever. I don't want to kill the random Democrats and Republicans who are in the Senate voting and talking. I just want the evil, the truly head honchos you know, the ones to be deposed, that's who I want. It's not about killing, it's not about anything other than a message of and also self achievement, self fulfillment of fuck you, I did it, I did what I could."

- "When I had the little ones [vodka bottles] on me I was hoping maybe I'll get lucky and see him come out and I can just like turn around light it and chuck it at his feet really fast. And it probably wouldn't have worked. And I'd probably get shot or tased and therefore probably killed. And I was just thinking, this is ridiculous. I think it was a test, and I think I did the right thing. The only violence that might have succeeded in anything, would be, to luckily, get him with the knife. Because then it's just him, there's no other harm, there's no variables. I got him, I did it."

- [Special Agent asks: "If would have seen him today without having to go through all of the security like that, would you have followed through with that?"]. "No, I think I would have continued to communicate with myself. I don't know if that's a cop out answer. I think I would have needed to know more. I was still, um figuring it out, and I think I figured it out, I think I passed the test of turning myself in because, um, cause at the end of all of that it was kind of the only thing left, and if I did . . . [Special Agent asks: "What was the only thing left? You turning yourself in or the the act?"]. Well, I mean like violence was off the table, burning shit was off the table, everything was just, it was just, I'm mad, I want to – I mean basically, the world is basically, the sky is falling, I need to do something. I do my best, and it's nothing. So I throw my hands up, you know. And I'm proud of myself, because I did my best. Whether or not, and when you ask me that question, if, and I might be like splitting hairs here, but if that was my best, or if that were to have been my best, then yes, I would have done it. If that was, if that had

turned out to be the right thing to do, then, yes, I would have taken that chance. I would have got to him as quick as I could, and done it.

- "I like didn't, um, go searching for how to hurt people or what the best to do. I didn't even, I didn't even, um research or look into how to get to Washington. I just knew that I would be able to when the time came. A while back, I bought a road atlas from Staples with cash and I didn't take my phone when I went so I would have only like the store footage and traffic cams."

- [About the lighter recovered], "I just like having that on me was a way to stay in touch with her kind of and also that like I was thinking it's a lighting device if I'm smoking a cigarette and I happen to come across a guy, just blast him with hand sanitizer . . . . Well, I just used it [hand sanitizer] for the rag, for the wick. I wrapped those little bottles. But the big bottle, I was thinking actually putting it into it, but with the little bottles I figured it would work to wrap it, to wet the rag with you know rubbing alcohol, light it, and then the rag around it's on fire and then when the glass shatters, it would make a little pool or whatever."

The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") conducted a preliminary query of the National Firearms Registration and Transfer Record (NFTR) and confirmed that the Defendant was not found to have registered such a device. The Defendant possessed and carried the "Molotov Cocktails" and knife knowingly, voluntarily, and on purpose, and not by mistake or accident. When the Defendant approached the area outside 1 First Street, Northwest, Washington, DC, the Defendant knowingly entered the Capitol Grounds and knew the "Molotov cocktails" were an incendiary device or similar device and were designed for use as a weapon.

This proffer of evidence is not intended to constitute a complete statement of all facts known by the parties but is a minimum statement of facts intended to provide the necessary factual predicate for the guilty plea. The limited purpose of this proffer is to demonstrate that there exists a sufficient legal basis for the defendant's plea of guilty to the charged crimes. This Statement of the Offense fairly and accurately summarizes and describes some of the defendant's actions and involvement in the offenses to which the defendant is pleading guilty.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/ Brendan M. Horan*
BRENDAN M. HORAN
Special Assistant United States Attorney
N.Y. Bar No. 5302294
United States Attorney's Office
601 D. Street, NW
Washington, DC 20579
202-730-6871
Brendan.Horan@usdoj.gov

## DEFENDANT'S ACKNOWLEDGMENT

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me. It does not include all of the facts known to me regarding this offense. I have read every word of this Statement of the Offense and reviewed it with my attorney. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crimes charged.

Further, I have discussed with my attorney Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, which ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions or plea proceedings if a guilty plea is later withdrawn. I knowingly and voluntarily waive the rights that arise under these rules in the event that I withdraw my guilty plea, withdraw from my Plea Agreement after signing it, or breach my Plea Agreement. I understand that, in such instances, the Government will be free to use against me, directly and indirectly, in any criminal or civil proceeding, any statements I have provided pursuant to the Plea Agreement, after it is signed, or after entry of the Plea Agreement, including any statements I made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorney, I agree to this Statement of the Offense, and declare under penalty of perjury that it is true and correct.

Date: 3/26/2026

Ryan Michael English
a/k/a Reilly Michael English
a/k/a Raleigh Jane English

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of Offense and reviewed it fully with my client. I concur in my client's desire to agree to this Statement of the Offense as true and accurate.

Further I have discussed with my client Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, which ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions or plea proceedings if a guilty plea is later withdrawn. I have discussed with my client that, by signing the Plea Agreement, my client waives the rights that arise under these rules in the event my client withdraws his guilty plea, withdraws from the Plea Agreement after signing it, or breaches the Plea Agreement.

Date: 3/26/2026

Maria Jacob
Attorney for Defendant