**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | :    **Case No. 25-CR-00134 (RC)** |
| **v.** | : |
| | : |
| **RYAN MICHAEL ENGLISH,** | : |
| also known as, "Reily" Michael English, | : |
| | : |
| **Defendant.** | : |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

In January 2025, angered by the election of Donald J. Trump, the Defendant drove overnight from Massachusetts to the United States Capitol armed with multiple Molotov cocktails and a knife, intending to assassinate then-Treasury Secretary nominee Scott Bessent ("Secretary Bessent") by burning him to death. The Defendant later admitted that the attack was intended to "depose" the United States' political leaders and "send a message."

This was not an impulsive attack. For approximately one month, the Defendant had been coldly plotting an act of deadly violence calculated to achieve a political purpose in Washington, D.C. The Defendant purchased an atlas with cash, left behind a cellular telephone to avoid digital tracking, wore clothing intended to conceal identity, assembled multiple Molotov cocktails, and traveled hundreds of miles to Washington armed with those weapons. The Defendant also prepared written messages explaining the attack and inscribed statements on the Defendant's arms reflecting motive and intent. At every point along the way, the Defendant knew the conduct was wrong, but ignored every possible opportunity to pull back.

After arriving at the Capitol, the Defendant spent more than an hour surveilling the grounds and searching for an unprotected entrance to the building to reach Secretary Bessent and carry out one of the gravest threats to public safety and the rule of law: a political assassination. It was only

after these fruitless efforts to find an unguarded path to Secretary Bessent—and upon the belief that law enforcement had already taken notice of the Defendant's suspicious behavior—that the Defendant surrendered to United States Capitol Police.

Against the backdrop of a well-documented and alarming rise in political violence, the Defendant's actions demand a serious sentence of imprisonment. As outlined below, based on the 3553(a) factors, the United States requests that the Court sentence Defendant **at the top of the applicable Sentencing Guidelines**, for a total sentence of **121 months of imprisonment**. Such a sentence is necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and deter both this Defendant and others from engaging in similar conduct. Anything less would fail to adequately account for the calculated nature of the Defendant's actions, the seriousness of the offense, and the broader threat such conduct poses to public officials who serve our country.

**<u>BACKGROUND</u>**

*<u>The Offense Conduct</u>*

On January 26, 2025, the Defendant left Massachusetts and drove to Washington, D.C., with the intention of killing the Secretary of Defense, and/or the Speaker of the House, and/or burning down a think tank based in Washington, D.C. located "two blocks from the White House." The Defendant explained that these actions were specifically designed to "depose" these political offices and send a message. The Defendant later told law enforcement that the Defendant had stopped overnight at a rest stop somewhere in New Jersey during the trip.

The next day, on January 27, 2025, the United States Senate was scheduled to vote to confirm Scott Bessent as the United States Secretary of the Treasury. *See* United States Probation Office's ("USPO") Presentence Investigation Report ("PSIR") at ¶ 14.

During a post-arrest interview with special agents of the United States Capitol Police on January 27, 2025, the told law enforcement that, while traveling to Washington, D.C., the Defendant stopped at a library in Chevy Chase, Maryland, learned of the confirmation proceedings through Reddit posts, and changed the intended target of the planned attack to Secretary Bessent. *See id*. at ¶ 33.

During the interview, the Defendant further admitted to planning the trip to Washington, D.C., about one to two months earlier. To avoid detection, the Defendant had purchased an atlas with cash, wore clothing to conceal identity, and deliberately left behind a cell phone to avoid surveillance and location tracking. The Defendant relied on the atlas to navigate to Washington, D.C., without creating a digital record of the trip.

The Defendant also explained to law enforcement during a custodial interview that the Defendant had purchased alcohol bottles on the way to Washington, D.C., to construct multiple Molotov cocktails. A "Molotov cocktail" is the common term for what is a destructive device or incendiary bomb. *Id.* at ¶ 15. The Defendant told law enforcement that the original plan was to use the small bottles of vodka to start fires. Later, the Defendant's plan was to wrap the bottles in rags soaked in alcohol, light the rags, and throw the devices at Secretary Bessent's feet. *Id.* at ¶ 37.

On the day of the confirmation vote, at approximately 1:57 p.m., the Defendant arrived on the U.S. Capitol Grounds. Surveillance video later reviewed by law enforcement revealed that from 1:57 p.m. until approximately 3:12 p.m., the Defendant walked loops around the grounds of the U.S. Capitol, scouting and surveilling the area and searching for a route to reach Secretary Bessent. During a custodial interview, the Defendant stated it would be necessary to kill, "at least," three U.S. Capitol Police Officers to get to Secretary Bessent. The Defendant further acknowledged being prepared to die during the attack.

At approximately 3:12 p.m., outside of 1 First Street, Northwest, Washington, DC, near the South Door of the U.S. Capitol Building, the Defendant approached a United States Capitol Police officer and stated, "I'd like to turn myself in." *Id.* at ¶ 15. The Defendant further stated that the Defendant was in possession of a knife and two Molotov cocktails. *Id.* Officers detained and searched the Defendant, who stated, "I've got a knife in my pocket, and Molotovs in my jacket." *Id.* at ¶ 16. Officers recovered a folding knife with a 3.5-inch blade in the Defendant's front right pants' pocket, as well as two Molotov cocktail destructive devices from the inside pockets of the Defendant's jacket. *Id.* The destructive devices were constructed of 50 milliliter bottles of Absolut brand vodka with a grey cloth affixed to each bottle's top. *Id.* The grey cloth had been soaked in an alcohol-based hand sanitizer. *Id.* A green BIC brand lighter was also recovered from the Defendant's pants' pocket. *Id.* The pictures below depict the two Molotov cocktails, knife, and lighter recovered from the Defendant's person.

 

While being searched, the Defendant stated that the bottles contained "Vodka, hand sanitizer on the rag, and a lighter." *Id.* When asked, "Is that really a Molotov cocktail?", the Defendant responded, "Well, it works." *Id.* Shortly thereafter, the Defendant was asked the following questions and gave the following responses:

Q. What are you doing here today?

A. **I was going to kill Scott Bessent**.

4

Q. Kill Scott Bessent?

A. Yes, sir.

*Id.*

When asked whether the Defendant had anything additional in the Defendant's vehicle, the Defendant advised that there was a "big bottle of vodka" in the Defendant's vehicle. *Id.* at ¶ 17. Law enforcement officers searched the Defendant's car for additional destructive devices. *Id.* at ¶ 19. The search uncovered a 750 milliliter bottle of Smirnoff 100 proof vodka and a grey sweatshirt with cloth cut from the sleeves. *Id.* The cloth of this sweatshirt was consistent with the cloth affixed to the destructive devices found on the Defendant's person. *Id.*

During a search of the Defendant's person prior to transport, law enforcement officers recovered a receipt in the Defendant's pants' pocket. *Id.* at ¶ 20. On the back of the receipt was written: "Judith dear god I am so sorry. You must understand I can feel myself dying slowly b/c of my heart. This is terrible but I cant do nothing while nazis kill my sisters. I love you. This is awful. Im so sorry. I love u. Please stay alive and heal. you can. you are strong enough. Fuck them for pushing us so far. you dont deserve this. Im so sorry for lying and plotting and lying. Please survive [drawings of 7 hearts.]" *Id.* at ¶ 20-21.

In addition, the words "NO FUTURE NO CHOICE" were hand-written on the Defendant's arm. *Id.* at ¶ 22. When asked why the Defendant was in Washington, D.C., the Defendant told officers, "pretty much the words on my arms say everything." *Id.*

Following the Defendant's arrest, the Defendant made the following statements, in sum and substance, to law enforcement, about his intentions:

- "I'd been **thinking about this for a while**, not this specifically I'd just been thinking about doing good and being good."

*Id.* at ¶ 23-24.

- **"I had been thinking about for this for a while because of Luigi Mangione**. I have seen the response to that and that situation . . . But as time goes on and as time went on, I started to understand things differently in my own personal situation, not regarding Luigi, regarding mainly the foremost thing is time—the feeling of running out of time, but of holy shit it's me . . . "

*Id.* at ¶ 25.

- "The thought of violence didn't occur to me until fairly recently and the thought of 'Holy shit it's me, it's my role unfortunately' not that there is a role and then it's me it's that **I have a role and unfortunately it's violence**. That's very important, it's the other way around."

*Id.* at ¶ 27.

- **"I was planning on burning down [a Washington, D.C.-based think tank], which is near the White House**. I was planning on getting there, asking and pretending . . . I was going to go there under the guise of I applied for an internship . . . I was going to go to the [think tank], tell them what they wanted to hear, and basically say that I was, 'oh I was emailing with [Individual-1] for a while, oh it must have been a scam, oh that's so unfortunate' and introduce myself . . . **I was just thinking of ways to meet [Individual-1], so I could kill [Individual-1] with . . . I was going to just slit [Individual-1's] throat because it was for revenge . . . I was going to go and do that, and if not that I was planning on burning down the building."**

*Id.* at ¶ 28.

- "So, that's what I was going to do. **I was gonna hurt big players**. I really had such faith, that I was expecting to bump into someone who I would recognize and go for it. I was thinking, **[the President's] in LA right now for the fires, maybe I'll catch him on the way back, ram my car into him and just drive my knife into him and then just die in the process**."

*Id.* at ¶ 30.

- "I get in the [Chevy Chase] library and I start searching for stuff, it's like 1:00 maybe, 12:30/1:00 o'clock, and **I see the news that Scott Bessent, who was a person I had in my mind in the past, in the recent past** . . . . He's the new pick for, I don't know if he's even been um sworn in, if like they voted, they're voting, they were voting for him today. I don't know . . ." [U.S. Capitol Police Special Agent asks, "Oh, the confirmation thing? For what, do you know"] "Treasury. Yup, he was going, but, I saw on Reddit without wanting this stuff . . . . on the popular page it shows you some things here and there, and I would kind

of like lowkey look through that stuff looking for stuff to come to me so that way it wasn't suspicious at all and I could kinda of stay in the know without appearing so politically inclined or whatever. There was this, Scott Bessent, I believe he's a billionaire . . . . "

*Id.* at ¶ 33.

- "Scott Bessent is, I think he got sworn in, I don't know. He's the, uh, Secretary of Treasury. That Reddit post that I was talking to you about was him being directly asked . . . . 'Do you think that the federal minimum wage should be increased from $7.25?' And he said without hesitation… 'No' and **he said it with a smile on his face and that got under my skin . . . . and this is how I decide who deserves to live or die** right? Because I don't get to make that decision, but it's as if they're making it for themself."

*Id.* at ¶ 34.

- "I was really going to just hope to find them down there and when I get to the library and I see Scott Bessent and **I'm like 'holy shit that's happening right now I can get down there within 30 minutes.'** I looked at the other previous . . . . voting sessions, and I was like 'oh these things take hours I have plenty of time.' And, when I got there, **I realized that, this is what it is . . . . He [Bessent] is just as deserving as the other people** . . . . "

*Id.* at ¶ 35.

- "I turned myself in because, when I got there, I realized that I had already made myself too suspicious with the big coat and the behavior and the carrying, literally talking to an obituary, and kissing it. I could tell, I'm not stupid they're keeping their eye on me. I saw [a police officer] keeping his eye on me. I walked around the place, I tried to look into where the construction was being done, I was like 'maybe I can get in there.' I came to the realization . . . they have three people at every single entrance, there are other people that I don't know, they're strangers, therefore they're innocents or whatever. I don't want to kill the random Democrats and Republicans who are in the Senate voting and talking. **I just want the evil, the truly head honchos you know, the ones to be deposed, that's who I want**. It's not about killing, it's not about anything other than a message of and also self achievement, self fulfillment of fuck you, I did it, I did what I could."

*Id.* at ¶ 36.

- "When I had the little ones [vodka bottles] on me I was hoping maybe I'll get lucky and see him come out and I can just like turn around light it and chuck it at his feet really fast. And it probably wouldn't have

worked. And I'd probably get shot or tased and therefore probably killed. And I was just thinking, this is ridiculous. I think it was a test, and I think I did the right thing. **The only violence that might have succeeded in anything, would be, to luckily, get him with the knife**. Because then it's just him, there's no other harm, there's no variables. I got him, I did it."

*Id.* at ¶ 37.

- [Special Agent asks: "What was the only thing left? You turning yourself in or the the act?"]. Well, I mean like violence was off the table, burning shit was off the table, everything was just, it was just, I'm mad, I want to – I mean basically, the world is basically, the sky is falling, I need to do something. I do my best, and it's nothing. So I throw my hands up, you know. And I'm proud of myself, because I did my best. Whether or not, and when you ask me that question, if, and I might be like splitting hairs here, but if that was my best, or if that were to have been my best, then yes, I would have done it. If that was, if that had turned out to be the right thing to do, then, yes, I would have taken that chance. **I would have got to him as quick as I could, and done it.**

*Id.* at ¶ 39.

- "I like didn't, um, go searching for how to hurt people or what the best to do. I didn't even, I didn't even, um research or look into how to get to Washington. **I just knew that I would be able to when the time came**. A while back, I bought a road atlas from Staples with cash and I didn't take my phone when I went so I would have only like the store footage and traffic cams."

*Id.* at ¶ 40.

- [About the lighter recovered], "I just like having that on me was a way to stay in touch with her kind of and also that like I was thinking it's a lighting device if I'm smoking a cigarette and I happen to come across a guy, just blast him with hand sanitizer . . . . Well, I just used it [hand sanitizer] for the rag, for the wick. I wrapped those little bottles. But the big bottle, I was thinking actually putting it into it, but with the little bottles I figured it would work to wrap it, to wet the rag with you know rubbing alcohol, light it, and then the rag around it's on fire and then when the glass shatters, it would make a little pool or whatever."

*Id.* at ¶ 41.

The Defendant possessed and carried the Molotov cocktails and knife knowingly, voluntarily, and on purpose, and not by mistake or accident. *Id.* at ¶ 42. When the Defendant

approached the area outside 1 First Street, Northwest, Washington, D.C., the Defendant knowingly entered the Capitol Grounds and knew the Molotov cocktails were an incendiary device or similar device and were designed for use as a weapon. *Id.*

*Procedural History*

On January 28, 2025, the Defendant was charged in United States District Court for the District of Columbia by Complaint with Unlawful Receipt, Possession, and/or Transfer of a Firearm, in violation of 26 U.S.C. § 5861, and Carrying a Firearm, Dangerous Weapon, Explosive, or Incendiary Device on the Grounds of the U.S. Capitol, in violation of 40 U.S.C. § 5104(e)(1)(A). ECF No. 1.

On May 8, 2025, a federal grand jury in the District of Columbia returned a two-count indictment, charging the Defendant with Attempting to Assassinate a Cabinet Member Nominee, in violation of 18 U.S.C. § 351(c), and Carrying a Firearm, Dangerous Weapon, Explosive, or Incendiary Device on the Grounds of the U.S. Capitol, in violation of 40 U.S.C. § 5104(e)(1)(A). ECF No. 16.

On March 20, 2026, the Government filed a Superseding Information, charging the Defendant with Unlawful Receipt, Possession, and/or Transfer of a Firearm, in violation of 26 U.S.C. § 5861(d) (Count One), and Carrying a Firearm, Dangerous Weapon, Explosive, or Incendiary Device on the Grounds of the U.S. Capitol, in violation of 40 U.S.C. § 5104(e)(1)(A) (Count Two). ECF No. 34.

On March 26, 2026, the Defendant pleaded guilty to both counts of the Superseding Information pursuant to a plea agreement. ECF No. 36. As part of the plea agreement, the Government agreed to dismiss Count One of the Indictment at the time of sentencing. *Id.* at 2. The parties also generally agreed to the applicable analysis of the Sentencing Guidelines computation,

with one significant exception. *Id.* at 2-5. Under the plea agreement, with regard to the applicable Guidelines, the parties may contest whether, pursuant to U.S.S.G. § 2K2.5(c), a cross reference for possessing a firearm or dangerous weapon in connection with the commission or attempted commission of another offense applies so that U.S.S.G. § 2A2.1(a)(1) (Assault with Intent to Commit Murder; Attempted Murder) would be the primary guideline. *See id.* at 2-3. The parties agreed to the application of the remaining Sentencing Guidelines provisions. *See id.* at 2-5. If the Defendant prevails and the cross reference to U.S.S.G. § 2A2.1(a)(1) is not applicable, then the parties estimated the Sentencing Guidelines range to be 37 to 46 months. *Id.* at 4. If the Government is correct that the cross reference is applicable, then the parties agreed that the Sentencing Guidelines range would be 97-121 months. *Id.* Both parties agreed to reserve allocution. *See id.* at 5-6.

**VICTIM IMPACT STATEMENT**

Secretary Bessent has provided the Government with a victim impact statement, which is attached hereto as **Exhibit A**.

**APPLICABLE LAW**

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

## THE APPLICABLE SENTENCING GUIDELINES

The applicable Guidelines are contested in this matter, as the parties disagree whether a cross reference under U.S.S.G. § 2K2.5(c) (for possessing the firearm or dangerous weapon in connection with the commission or attempted commission of another offense) is applicable.[1] The estimated calculations in the PSIR are consistent with the Government's calculations.

---

[1] The plea agreement identified the issue as contested by the parties. *See* ECF No. 36 at 2-3.

*Uncontested Issues*

The parties and the USPO agree that the Defendant has zero Criminal History Points and therefore falls within Criminal History Category I. *See* ECF No. 36 at 4; PSIR at ¶ 62.

The parties and the USPO further agree that Counts One and Two of the Superseding Information are grouped together into a single Group for Guideline calculation purposes pursuant to U.S.S.G. § 3D1.2(b) because they involve the same victim and two or more acts connected by a common criminal objective or a common scheme or plan. *See* ECF No. 36 at 3; PSIR at ¶ 49. The parties agree that under U.S.S.G. § 3D1.3(a), the offense level for the Group is equal to whichever is the higher offense level of either Counts One or Two. *See* ECF No. 36 at 3.

The parties and the USPO further agree as to the calculations regarding Count One of the Superseding Information, for violation of 26 U.S.C. § 5861(d), as outlined in the plea agreement:

**26 U.S.C. § 5861(d)**

| | | |
|---|---|---|
| U.S.S.G. § 2K2.1(a)(5) | Base Offense Level | 18 |
| U.S.S.G. § 2K2.1(b)(3)(B) | Destructive Device | +2 |
| U.S.S.G. § 2K2.1(b)(6)(B) | Another Felony Offense | +4 |
| | Total | 24 |

The applicable Guidelines section is U.S.S.G. § 2K2.1: Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition; Prohibited Transactions Involving Firearms or Ammunition. *See* ECF No. 36 at 2-3; PSIR at ¶ 47. Pursuant to U.S.S.G. § 2K2.1(a)(5), the Base Offense Level of Count One is 18 because the offense involved a firearm described in 26 U.S.C. § 5845(a). *See* ECF No. 36 at 2. Pursuant to U.S.S.G. § 2K2.1(b)(3)(B), a two-offense level increase is required because the offense involved a destructive device. *See id.* at 3. In addition, the parties agree that a four-level increase is appropriate pursuant to U.S.S.G. § 2K2.1(b)(7)(B) because the Defendant possessed a firearm with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense. *See id.* at 3.

The parties and the USPO also agree that with regard to the Defendant's conviction for Count Two of the Superseding Information, for violation of 40 U.S.C. § 5104(e)(1)(A), the applicable Guidelines section is U.S.S.G. § 2K2.5: Possession of Firearm or Dangerous Weapon in Federal Facility; Possession or Discharge of Firearm in School Zone. *See id.*; PSIR at ¶ 50.

The parties also agree that under U.S.S.G. § 2K2.5(a), the Base Offense Level for Count Two of the Superseding Information is 6. *See* ECF No. 36 at 3. Both parties believe that no Specific Offense Characteristics under U.S.S.G. § 2K2.5(b) apply in this matter. *See id.*

### *The Parties' Dispute*

The parties disagree as to whether the cross reference under U.S.S.G. § 2K2.5(c) applies to the Defendant's conviction. U.S.S.G. § 2K2.5(c) states as follows:

(1)     If the defendant used or possessed any firearm or dangerous weapon in connection with the commission or attempted commission of another offense, or possessed or transferred a firearm or dangerous weapon with knowledge or intent that it would be used or possessed in connection with another offense, apply –

(A)     2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense if the resulting offense level is greater than that determined above[.]

Under U.S.S.G. § 2X1.1, the base offense level from the guideline for the substantive offense applies. While generally there is a three-level decrease for attempts under U.S.S.G. § 2X1.1(b)(1), the decrease does not apply "[w]hen an attempt, solicitation, or conspiracy is expressly covered by another offense guideline section . . . . " U.S.S.G. § 2X1.1(c)(1).

### *Calculations of the Government and the PSIR*

The Government and the USPO calculate the Defendant's offense level as 33. ECF No. 36 at 3; PSIR at ¶ 49.

Under U.S.S.G. § 2K2.5(a), the Defendant's base offense level would be 6. None of the specific offense characteristics of U.S.S.G. § 2K2.5(b) appear to apply.

However, the Government and the USPO agree that the established facts support a cross

reference under U.S.S.G. § 2K2.5(c) to the primary guideline for Assault with Intent to Commit Murder; Attempted Murder (U.S.S.G. § 2A2.1) because the Defendant possessed the Molotov cocktails and knife in connection with an attempt to commit the unlawful and premeditated killing of a human being with malice aforethought. *See* 18 U.S.C. § 1111. The Defendant planned the attack for approximately one month, acquired and assembled multiple destructive devices, traveled hundreds of miles to Washington while deliberately avoiding detection, selected Secretary Bessent as the target after learning of the confirmation vote, surveilled the Capitol Grounds for more than an hour in search of an opportunity to carry out the attack, and explicitly admitted to law enforcement on multiple occasions that the Defendant came to D.C. intending to kill Secretary Bessent. Based on these facts and the Defendant's own repeated and explicit admissions, the base offense level of 33 under U.S.S.G. § 2A2.1(a)(1) should apply, because the object of the offense would have constituted first degree murder, *i.e.*, "murder perpetrated by . . . lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing . . . " *See* 18 U.S.C. § 11111.

Because U.S.S.G. § 2A2.1 expressly covers "attempted murder," there is no three-level decrease under U.S.S.G. § 2X1.1(b)(1). *See* U.S.S.G. § 2X1.1(c)(1). The offense level of 33 under U.S.S.G. § 2A2.1(a)(2) is therefore the applicable level for Count Two of the Superseding Information because the resulting offense level is greater than the offense level under U.S.S.G. §§ 2K2.5(a) and (b). *See* U.S.S.G. § 2X1.1(c)(1).

Because the offense level of 33 for Count Two of the Superseding Information is greater than the offense level for Count One of the Superseding Information, the offense level for the single Group is 33. *See* U.S.S.G. § 3D1.3(a).

The Defendant would then receive a three-level reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility. Thus, with a Criminal History Category of I and a Total Offense

Level of 30, the Guidelines sentencing range computed by the Government and U.S. Probation would be 97 to 121 months of imprisonment. *See* U.S.S.G. Ch. 5 Part A; *see also* ECF No. 36.

### *Defendant's Calculations*

Contending that the cross reference under U.S.S.G. § 2K2.5(c) does not apply because "there is insufficient evidence of guilt on the substantive offense of attempt murder," the Defendant instead calculates an offense level of 6 for Count Two of the Superseding Information pursuant to U.S.S.G. § 2K2.5(a). *See* PSIR at 25

Because the offense level of 24 for Count One of the Superseding Information is greater than the Defendant's calculated offense level for Count Two of the Superseding Information, the Defendant calculated the offense level for the Group as 24.

The Defendant would then receive a three-level reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility. Thus, with a Criminal History Category of I and an Offense Level of 24, the Guidelines sentencing range would be 37 to 46 months of imprisonment as argued by the Defendant. *See* ECF No. 36 at 4.

### **ARGUMENT AS TO APPLICABLE GUIDELINES**

The Government must establish applicable sentencing enhancements by a preponderance of the evidence. *See United States v. Flores-Hernandez*, 176 F.4th 714, 717 (D.C. Cir. 2026) ("At sentencing, the district court may make findings of fact under a preponderance-of-the-evidence standard . . . " (quoting *United States v. Ventura*, 650 F.3d 746, 749 (D.C. Cir. 2011)). The facts in this case and the facts to which the Defendant admitted to in the Statement of Offense in Support of Guilty Plea (ECF No. 37) support the application of the cross reference under U.S.S.G. § 2X1.1(c)(1) to U.S.S.G. § 2A2.1 because the Defendant intended to use the Molotov cocktails and the knife possessed on the Capitol Grounds to commit First Degree Murder and engaged in conduct that constituted a substantial step toward committing First Degree Murder.

U.S.S.G. § 2A2.1 applies to "Assault with Intent to Commit Murder; Attempted Murder," and subsection (a)(1) states that the Base Offense Level is "33, if the object of the offense would have constituted first degree murder." Commentary Note 1 to U.S.S.G. § 2A2.1 instructs that, "[f]or purposes of this guideline: 'First degree murder' means conduct that, if committed within the special maritime and territorial jurisdiction of the United States, would constitute first degree murder under 18 U.S.C. § 1111."

"First-degree murder, 18 U.S.C. § 1111, has three elements: *First*, an unlawful killing. A killing is unlawful absent a justification like self-defense. *Second*, malice aforethought. Malice aforethought means the defendant either intended to kill or consciously disregarded an extreme risk of death or serious bodily injury. Malice aforethought can be negated by a mitigating circumstance like a mistaken apprehension of the need to use self-defense. *Third*, premeditation. Premeditation requires the defendant to have deliberated—at least for a few seconds—before killing the victim." *United States v. Slatten*, 395 F. Supp. 3d 45, 55 (D.D.C. 2019); *accord* Pattern Crim. Jury Instr. 5th Cir. 2.52A (2024), (2024); Model Crim. Jury Instr. 8th Cir. 6.18.1111A (2026).

To establish an attempt to commit a crime, the Government must show that: *first*, the Defendant intended to commit the crime; and *second*, the defendant engaged in conduct that constituted a substantial step toward committing the crime. *See* 1 Criminal Jury Instructions for DC Instruction 7.101.

The record overwhelmingly established that the Defendant possessed the specific intent to murder Secretary Bessant and took multiple substantial steps toward assassinating him.[2] For

---

[2] It is notable that a federal grand jury indicted and found probable cause that the Defendant for the attempted assassination of Secretary Bessent in violation of 18 U.S.C. § 351(c).

approximately one month, the Defendant planned the attack, assembled multiple Molotov cocktails, deliberately avoided electronic surveillance by leaving behind cellular devices, obtained materials for and constructed multiple Molotov cocktails, traveled hundreds of miles from Massachusetts to Washington armed with destructive devices and a knife, researched potential targets, selected Secretary Bessant after learning of the confirmation vote, and spent more than an hour surveilling the Capitol Grounds while searching for an opportunity to carry out the assassination. Immediately upon apprehension and then again throughout custodial interview, the Defendant repeatedly and explicitly admitted intending to kill Secretary Bessent, ultimately confirming to law enforcement unambiguously: "*I was going to kill Scott Bessent.*" *Id.* at ¶ 16. The officer asked for confirmation, "Kill Scott Bessent?" And the Defendant's answer was again unequivocal: "**Yes, sir.**" During a subsequent interview with law enforcement hours later, **the Defendant repeatedly reiterated the intent to use the weapons to kill Secretary Bessent**.

The Defendant later admitted to law enforcement during an interview that just outside of Washington, D.C., the Defendant had stopped to further research specific targets. It was at that time that the Defendant learned that it was the day of Secretary Bessent's confirmation vote in the United States Senate. The Defendant later told law enforcement that it was at this moment that an intent was formed to kill Secretary Bessent in particular, stating:

> "Scott Bessent is, I think he got sworn in, I don't know. He's the, uh, Secretary of Treasury. That Reddit post that I was talking to you about was him being directly asked . . . . 'Do you think that the federal minimum wage should be increased from $7.25?' And he said without hesitation… 'No' and he said it with a smile on his face and that got under my skin . . . . *and this is how I decide who deserves to live or die right?* Because I don't get to make that decision, but it's as if they're making it for themselves."

The Defendant then did further research and determined that there was likely sufficient time left before the vote concluded that the Defendant would be able to make the approximately thirty-minute-long trip to the United States Capitol. The Defendant explained:

17

"I was really going to just hope to find them down there and when I get to the library and I see Scott Bessent and I'm like 'holy shit that's happening right now I can get down there within 30 minutes.' I looked at the other previous . . . . voting sessions, and I was like 'oh these things take hours I have plenty of time.' And, when I got there, I realized that, this is what it is . . . . He [Bessent] is just as deserving as the other people . . . . "

Thus, the Defendant admitted to having deliberated and formed a premeditated intent to kill Secretary Bessent before proceeding to travel a further 30 minutes to the Capitol Grounds.

The Defendant then continued driving to the United States Capitol Grounds. By the time the Defendant arrived at the Capitol, the planning phase had ended and execution of the plan had begun. The Defendant had already acquired and assembled the murder weapons, traveled to Washington while deliberately attempting to avoid detection, selected the intended victim, written multiple notes explaining intent and motive, and entered the Capitol Grounds armed with multiple Molotov cocktails and a knife. The Defendant then spent more than an hour searching for an opportunity to reach Secretary Bessant, while acknowledging that killing Capitol Police officers might be necessary to accomplish that objective. These objective acts, coupled with the Defendant's repeated admissions of intent, constitute multiple substantial steps toward the commission of first-degree murder.

The Defendant abandoned the attack only after concluding that the presence of the United States Capitol Police and Capitol security made success unlikely. The Defendant did not abandon the intent to kill Secretary Bessant, rather, the Defendant surrendered only after determining that the assassination could not successfully be carried out under the circumstances. That distinction confirms, rather than undermines, that the Defendant had progressed beyond preparation and into criminal attempt.

Accordingly, because the object of the Defendant's offense would have constituted first-degree murder and the Defendant took substantial steps towards accomplishing that objective the

18

cross-reference of U.S.S.G. 2K2.5(c)(1)(A) applies and U.S.S.G. § 2A2.1(a)(1) is the appropriate primary Guideline.

**THE GOVERNMENT'S SENTENCING RECOMMENDATION**

The Government requests that the Court sentence the Defendant on Count One to 120 months of imprisonment, followed by 3 years of supervised release, and sentence the Defendant on Count Two to 60 months of imprisonment, with one month to be served consecutively to the sentence in Count One and 59 months to be served concurrently,[3] followed by 3 years of supervised release for **a total sentence of 121 months of imprisonment and three years of supervised release**. A sentence at the top of the Guidelines range is necessary and appropriate to reflect the nature of these offenses and provide adequate deterrence to others in the community, particularly given the egregiousness of the Defendant's offenses—bringing Molotov cocktails and a knife to the United States Capitol with the intent to carry out an assassination of an incoming Cabinet official to "send a message."

The Government also concurs in the Mandatory and Standard Conditions of Supervision, along with the Additional Conditions of Supervision proposed by the USPO. *See* PSIR at ¶¶ 124-26. The Government also proposes two additional conditions of supervision be that: (1) "You must not communicate, or otherwise interact, with the victim or the victim's immediate family, either directly or through someone else, without first obtaining the permission of the probation officer" and (2) "You must not attend any events outside of Washington, D.C., at which it is publicized in

---

[3] The Government's requested sentenced is consistent with the Guidelines applicable here, which state that, "If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law." U.S.S.G § 5G1.2(d).

advance that current cabinet-level officials will be in attendance."

## I.   The Nature and Circumstances of the Defendant's Offenses.

The nature and circumstances of the Defendant's offenses are bone-chilling and warrant a sentence of imprisonment at the top end of the Guidelines, 121 months. The Defendant brought Molotov cocktails to the United States Capitol Grounds to carry out a pre-planned, cold-blooded political assassination of a Cabinet member Nominee by burning him to death. The Defendant targeted Secretary Bessent to "send a message" politically to the incoming Trump administration. The Defendant knew the conduct was wrong, yet carried through with the attempt until prevented by the presence of law enforcement.

In the Defendant's own words, while lurking on the Capitol grounds in possession of two Molotov cocktails and a knife, "I was hoping maybe I'll get lucky and see [Secretary Bessent] come out and I can just like turn around light [the Molotov cocktail] and chuck it at his feet really fast." Failing that, the Defendant told law enforcement, "The only violence that might have succeeded in anything, would be, to luckily, get [Secretary Bessent] with the knife. Because then it's just him, there's no other harm, there's no variables. I got him, I did it."

As discussed above, the Defendant's offenses were not spur-of-the-moment. To get to that point, the Defendant deliberately planned and took significant steps, all the while taking measures to prevent discovery by law enforcement. The Defendant had been preparing to come to Washington, D.C., for "one to two months." The Defendant described agonizing over the decision to engage in political violence for an extended period, yet ultimately decided to carry through on the attempted assassination anyway. The Defendant went so far as to assemble Molotov cocktails, travel to the Capitol Grounds, and surveil the building for an unguarded path to Secretary Bessent. The Defendant only abandoned the scheme when the presence of law enforcement made success

unlikely, telling law enforcement that, "[w]hen I got there, I realized that I would have to, if I wanted to even get into the building, I would have to kill Capitol police officers with a knife. I would have to kill three men who are stronger and more equipped than me just to get through the door, and realistically, even with God on my side, fate, realistically that's stupid and I wouldn't get far enough."

And the Defendant did not just decide to commit a political assassination, but intended to do so in a particularly gruesome manner—by using a Molotov cocktail to attempt to burn Secretary Bessent to death. The Defendant's choice was designed to increase the ghastliness of the crime, but also the spectacle. However, the means also significantly increased the risk of others nearby, such as Secretary Bessent's family, aides, and any law enforcement escort that may have been in the vicinity at the time. The nature of the Defendant's attempted crime was calculated to be particularly horrific, all designed to "send a message" to the incoming administration.

The fear created in those threatened and the seriousness of the offense must be understood in the context of an increased risk of violence against public officials, including in all branches of government and at the local and federal level. Unfortunately, the political violence occurring in today's society is all too real, and public officials and their families are forced to take attempts of physical violence such as the Defendant's seriously.

In sum, the nature and circumstances of the Defendant's conduct clearly demonstrate the intent to instill fear and disrupt the office of a public official specifically, and the Government generally. Thus, the horrifying nature and circumstances of the Defendant's offenses justify a high-end sentence of 121 months of incarceration.

## II.    <u>The History and Characteristics of the Defendant.</u>

The Defendant's personal history and characteristics support that the Defendant understood

21

the gravity of the offenses, yet undertook them anyway.

The Defendant is twenty-six years old with some college education. *See* PSIR at ¶ 71. The Defendant's interview demonstrates that the Defendant was clearly thoughtful and attuned to current events and the harm that would be caused by the Defendant's actions. And the Defendant's actions demonstrate that the offenses were not impulsive or fleeting, but the result of sustained planning, ongoing preparation, and preparation for violence despite the Defendant's recognition of the harm that would ensue.

While the PSIR describes a history of mental health and substance abuse issues, the circumstances make abundantly clear that, despite any such issues, the Defendant was well aware at every step of the way that the Defendant's actions were wrong and unlawful, yet carried through with them anyway. Indeed, in the Defendant's post-arrest interview, the Defendant exhaustively described mentally grappling with the decision to commit political violence. The Defendant told law enforcement, "I'd been thinking about this for a while, not this specifically I'd just been thinking about doing good and being good." The Defendant discussed being inspired by Luigi Mangione, who is charged with the December 2025 targeted murder of the CEO of a health insurance company. The Defendant described initially thinking Mangione's actions were "stupid," but with time coming to "understand things differently in my own personal situation." Eventually, the Defendant told law enforcement, "I see [Mangione] as a person who was wronged and who had no way of making things right other than that…He said fuck it and he went for it. And, like, a lot of people like him for it, and like, I see him, and I'm like, you know, I understand what he did." Ultimately, the Defendant came to the conclusion that murder was the Defendant's role also, telling law enforcement "[t]he thought of violence didn't occur to me until fairly recently and the thought of 'Holy shit it's me, it's my role unfortunately' not that there is a role and then it's me

22

it's that I have a role and unfortunately it's violence."

However, for all of the contemplation and justification, the Defendant recognized the conduct for what it was, stating, "For everything I've said **yes, I was going to kill a man in cold blood who I never met yes**." When speculating as to what would have happened if the plan had been successful, the Defendant described the situation, "Okay I just did unbelievable evil and harm, what's the response gonna be?" While the Defendant appears to have struggled with mental health conditions and substance abuse, these issues did not prevent the Defendant from recognizing that the planned offenses were repugnant. Without minimizing the Defendant's struggles, there can be no contention that such issues excuse, nor did they cause, the Defendant's behavior.

The Defendant's knowledge that the offense was wrong is further evidenced by the steps taken to conceal actions from law enforcement, the deliberate decision to avoid involving or informing others of the Defendant's plan, and the Defendant's decision to self-surrender to law enforcement.

The Defendant also should not be given undue credit for surrendering to law enforcement, as the Defendant believed law enforcement was already suspicious and intended to apprehend the Defendant anyway. Indeed, the Defendant explained to law enforcement that the reason for surrendering was, "I turned myself in because when I got there I realized that I had already made myself too suspicious with the big coat and the behavior and the carrying, literally talking to an obituary, and kissing it. I could tell, I'm not stupid they're keeping their eye on me. I saw the [officer] keeping his eye on me." Therefore, while the Defendant did peacefully surrender to law enforcement, it was only because the Defendant believed apprehension was imminent anyway. Put simply, the only reason the Defendant abandoned the attempted assassination was to mitigate the harm to the Defendant, not Secretary Bessent.

23

And while the Defendant has no prior criminal convictions, the Guidelines sentencing range already accounts for his low criminal history. In addition, the Guidelines explicitly exclude the Defendant from receiving the benefit of an adjustment for zero-point offenders because he "possessed . . . a firearm or other danger weapon . . . in connection with the offense" *See* U.S.S.G. § 4C1.1(a)(7).

Here, there is no basis for a downward variance from the established sentencing Guidelines. On the contrary, the Defendant's personal history and characteristics in committing this crime weigh in favor of a sentence at the high-end of the Guidelines.

### III.    The Need for the Sentence Imposed to Fulfill the Purposes of Sentencing

The requested sentence is sufficient but not greater than necessary to meet the goals of sentencing. The sentence is just, reflects the seriousness of the offense, promotes respect for the law, and also provides deterrence to such criminal conduct. As noted above, political violence in this country, including attempts at assassination, continues to rise and a sentence at the top of the Guidelines range is necessary. The Government's requested sentence will signal to the community that attempts at political violence are taken incredibly seriously and hopefully deter others from engaging in similar conduct. It will also provide an opportunity for the Defendant to reflect on the serious nature of these offenses and keep the community safe in the meantime.

In sum, a sentence at the top of the Guidelines range is reasonable, just, and necessary.

A.    To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense, 18 U.S.C. § 3553 (a)(2)(A)

The attempted assassination of a public official is among the most serious offenses addressed by federal courts and shows a flagrant disrespect for the law.

Here, the Defendant planned and attempted to carry out the murder of a public official because of a disagreement with the official's political positions. The planned killing was designed

"to take out the top to send a message." The Defendant's vacillation between potential targets makes clear that the act and the message were not specific to Secretary Bessent, but were instead intended to harm and cause fear in the incoming presidential administration. The Defendant's offense was a violent response designed to thwart an incoming presidential administration with whom the Defendant disagreed, by violently killing one of its most senior members. Public officials in this country must be free to carry out their duties without threat of violence or intimidation. The Defendant's attempt to strike fear in members of the incoming administration are repugnant to our form of government and must necessarily be dealt with harshly by the Court.

In addition, the Defendant's choice of weapons and location —bringing Molotov cocktails to the United States Capitol—to carry out the offense is particularly troubling. The Defendant chose to assemble and bring Molotov cocktails, an inaccurate and indiscriminate weapon, that is uncontrollable once deployed and likely to cause extreme pain, death, and serious bodily injuries across a large area, to a public space packed with Members of Congress, their staff, and tourists alike. The Defendant's decision to place not just Secretary Bessent, but his staff, family, lawmakers, their staff, constituents, tourists, and the general public at risk of death or injury by the resulting flames and smoke merits a significant sentence.

The Defendant's conduct—bringing incendiary devices to the United States Capitol to attempt a political assassination designed to send a message to a new Presidential administration— could hardly be more serious and clearly demonstrate why a sentence at the high end of the Guidelines range is essential to promote respect for the law. It is essential that the sentence imposed in this case promote respect for our system of law by powerfully sending the message that violence is not an acceptable means of expressing political dissatisfaction.

B.  To Afford Adequate Deterrence to Criminal Conduct, 18 U.S.C. § 3553(a)(2)(B)

It is of utmost importance that the sentence for the Defendant's offenses adequately deter

further criminal conduct, both by the Defendant and others.

Unfortunately, the Defendant is not alone in seeking to settle political disagreements through violence and murder. There are examples of an increase in political violence across all branches and levels of government.[4]

The sentence in this case must reflect the need to deter others from committing acts of lawless violence for political ends, but also incapacitate the Defendant from further such actions. The Defendant's own words underscore why a top of the Guidelines sentence is necessary. As discussed above, during a custodial interview, the Defendant admitted to drawing inspiration from and described the highly publicized killing of the CEO of UnitedHealthcare approximately one

---

[4] *See e.g.*, Ashley Parker, ***Shooting at Trump rally*** *upends presidential campaign*, THE WASHINGTON POST (Jul. 14 2024), https://www.washingtonpost.com/politics/2024/07/13/trump-shooting-campaign-politics/; Jeremy Roebuck, et al., ***Trump ally Charlie Kirk gunned down*** *in brazen act of political violence*, THE WASHINGTON POST (Sept. 11, 2025), https://www.washingtonpost.com/national-security/2025/09/10/kirk-shooting-political-violence/; Rachel Pannett & María Luisa Paúl, *What to know about the possible **assassination attempt at Trump's golf course***, THE WASHINGTON POST (Sept. 16, 2024), https://www.washingtonpost.com/politics/2024/09/16/trump-golf-assassination-attempt-what-to-know/; Jada Yuan and Kadia Goba, *Utah police arrest man accused of **assaulting Rep. Maxwell Frost***, THE WASHINGTON POST (Jan. 25, 2026), https://www.washingtonpost.com/politics/2026/01/25/maxwell-frost-sundance-assault/; Maegan Vazquez, *Federal and local authorities charge man accused of **attack on Rep. Omar***, (Jan. 29, 2026), THE WASHINGTON POST https://www.washingtonpost.com/politics/2026/01/29/justice-department-charge-omar-attack/; Patrick Marley et al, ***Minn. lawmaker, husband killed in shooting***, *setting off search for gunman*, THE WASHINGTON POST (Jun. 14, 2025), https://www.washingtonpost.com/nation/2025/06/14/minnesota-lawmakers-melissa-hortman-targeted-shooting/; Eugene Scott, *Assailant shouted 'Where is Nancy?' in break-in at speaker's home, **attack on Paul Pelosi***, THE WASHINGTON POST (Oct. 28, 2022), https://www.washingtonpost.com/politics/2022/10/28/paul-pelosi-attack-san-francisco/; ***Son of US District Judge Esther Salas was killed***, *and her husband shot at New Jersey home, chief district judge says*, THE WASHINGTON POST (Jul 19, 2020), https://www.washingtonpost.com/national/son-of-us-district-judge-esther-salas-was-killed-and-her-husband-shot-at-new-jersey-home-chief-district-judge-says/2020/07/19/96dc552a-ca33-11ea-99b0-8426e26d203b_story.html; Andrew Jeong, ***Indiana judge and his wife injured in shooting*** *at their home, police say*, THE WASHINGTON POST (Jan. 20, 2026), https://www.washingtonpost.com/nation/2026/01/20/judge-steve-meyer-indiana/.

month earlier as the event that caused the Defendant to being seriously contemplating political violence. Rather than viewing the murder as a cautionary example, the Defendant reflected on it, internalized it, and ultimately concluded that violence was an appropriate means of advancing the Defendant's own political objectives. As the Defendant explained: "I had been thinking about for this for a while because of Luigi Mangione."

The Defendant, viewing those actions, ultimately decided that violence was the right answer, stating, "[t]he thought of violence didn't occur to me until fairly recently and the thought of 'Holy shit it's me, it's my role unfortunately' not that there is a role and then it's me it's that I have a role and unfortunately it's violence." The Defendant decided, "That's what I was going to do. I was gonna hurt big players."

These statements are particularly troubling because they demonstrate that the Defendant consciously modeled the planned assassination on another highly publicized act of violence. Rather than recoiling from that crime, the Defendant viewed it as justification for committing another targeted killing. The Defendant's own words reveal a deliberate reflection, ideological motivation, and a calculated decision to use lethal violence against a senior government official to "send a message." That willingness to emulate a notorious act of calculated violence underscores both the extraordinary danger posed by the Defendant's conduct and the need for a sentence that provides meaningful deterrence to similar acts of copycat political violence.

A sentence at the top of the Guidelines also provides general deterrence: it will signal to the community that traveling to the United States Capitol to engage in premeditated violence there merely to garner public attention is a serious and unacceptable act. Such behavior has become

increasingly common[5] and a substantial sentence will hopefully deter others from doing so.

It is paramount that the Court respond to the Defendant's attempt to "send a message" through political violence with its own message—via a significant sentence imposed through the proper legal process— that the costs imposed for attempting to override our constitutional system of government through attempted murder vastly outweigh any perceived benefit, political or otherwise.

C.  To Protect the Public from Further Crimes of the Defendant, 18 U.S.C. § 3553(a)(2)(C)

A top of the Guidelines sentence is also necessary to protect the public from further crimes by the Defendant. The Defendant did not merely plan to assassinate Secretary Bessent. Rather, the Defendant admitted during a custodial interview to contemplating violence against multiple high-ranking government officials and other politically significant targets before ultimately selecting Secretary Bessent.

The need to protect the public is further underscored by the Defendant's repeated admissions that political violence was viewed as an acceptable means of accomplishing personal objectives. Among the most terrifying aspects of the Defendant's offenses is the Defendant's contemplation of various difference general acts violence for political reasons. The Defendant was not initially focused specifically on the attempted assassination of Secretary Bessent. Instead, the

---

[5] *See e.g.*, USCP Officers Stop & Arrest Man with Loaded Shotgun Outside the U.S. Capitol, Feb. 17, 2026, available at https://www.uscp.gov/media-center/press-releases/uscp-officers-stop-arrest-man-loaded-shotgun-outside-us-capitol; Man Charged for Planting Explosive Devices outside the RNC and DNC on January 5, 2021. Dec. 4, 2025, available at https://www.justice.gov/usao-dc/pr/man-charged-planting-explosive-devices-outside-rnc-and-dnc-january-5-2021; USCP Arrests Man Who Attempted to Light Car on Fire, Jan. 8, 2025, https://www.uscp.gov/media-center/press-releases/uscp-arrests-man-who-attempted-light-car-fire; USCP Arrests Man with Flare Gun, Torch Lighter, & Bottles of Fuel, Nov. 6, 2024, https://www.uscp.gov/media-center/press-releases/uscp-arrests-man-flare-gun-torch-lighter-bottles-fuel; Update: Checkpoint Attack, Apr. 6, 2021, available at https://www.uscp.gov/media-center/press-releases/checkpoint-attack-update.

Defendant discussed with law enforcement that the decision to travel to Washington, D.C., was made with the intention of various possible violent actions, such as killing the Secretary of Defense, and/or the Speaker of the House, and/or the President. The Defendant told law enforcement, "that's what I was going to do. I was gonna hurt big players. I really had such faith, that I was expecting to bump into someone who I would recognize and go for it. I was thinking, [the President is] in LA right now for the fires, maybe I'll catch him on the way back, ram my car into him and just drive my knife into him and then just die in the process."

If the Defendant had not found a target upon arrival to Washington, D.C., the Defendant later told law enforcement that, "[m]y thoughts and you know whatever, super incriminating stuff, SCOTUS, the Senate, running into Trump, and also like if all else were to fail, I could stake it out and just kind of like stay there like in the area and figure out what I wanted to do, whether it took days or weeks because I was kind of stuck there at that point."

Given the Defendant's wide-ranging list of targets and willingness to follow through with unlawful acts of violence, an extended period of incarceration is necessary to protect the public, including specifically other public servants and those dedicated to protecting them, from the Defendant.

    D.  <u>The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct, 18 U.S.C. § 3553(a)(6)</u>

Finally, the Government notes that in the PSIR, the United States Probation Office provided Judiciary Sentencing Information for the last five fiscal years. *See* PSIR at ¶ 139. According to that information, 100% of defendants with the same Final Offense Level and same Criminal History Category as the Defendant received a sentence of imprisonment. *Id.* Of all of the defendants whose primary guideline was U.S.S.G. § 2A2.1 (Assault with Intent to Commit Murder; Attempted Murder) with the same Final Offense Level and same Criminal History

29

Category as the Defendant, the average length of imprisonment imposed was 92 months and the median length of imprisonment was 85 months. *Id.*

In light of the abhorrent nature of the Defendant's offense—an attempt to use a Molotov cocktail to burn a Cabinet member nominee to death in a political assassination—the Government submits that a sentence higher than the average sentence according to the Judiciary Sentencing Information is warranted and necessary, and would not result in any undue disparity to other similarly situated defendants.

<u>**CONCLUSION**</u>

For all the foregoing reasons, the Government respectfully requests that the Court impose a total sentence of 121 months imprisonment, followed by 3 years of supervised release.

Respectfully submitted,

Jeanine Ferris Pirro
United States Attorney

By:        */s/ Brendan M. Horan*
Brendan M. Horan
Special Assistant United States Attorney
N.Y. Bar No. 5302294
601 D Street NW
Washington, DC 20579
(202) 730-6871
Brendan.Horan@usdoj.gov