**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 25-CR-134 (RC)** |
| | ) | |
| **RILEY ENGLISH** | ) | |
| | ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Riley English, by her attorney, hereby submits the following memorandum in aid of sentencing in this matter.

Ms. English is a young transexual woman who has experienced trauma and suffering from the day she was born. ██████████████████████████ ███████████████████████████████████████ █████████████████████████████████████ ██████████████████████████████████.

In addition, Ms. English had a challenging upbringing. She knew from a young age that she was transgender but was not able to be herself because of her home environment and her parents' religious beliefs that prevented them from supporting their child in the way that she needed. Her lack of family support and decline in her physical and mental health led to an unstable life prior to her arrest in the instant matter. When the current administration announced its anti-transgender agenda, Ms. English's instability took a further decline. Then, the unimaginable happened, her significant other committed suicide. Ms. English's

mental health was in dire condition when she came to D.C. as a cry for help to anyone who could save her from her mental suffering.

Ever since her arrest on January 28, 2025, Ms. English has been in continuous custody at the Correctional Treatment Facility (CTF). Her time in custody has stabilized her, allowed her to begin mending her relationship with her parents, given her peace and new perspective, and instilled in her a passion and desire to pursue a career in culinary arts. Ms. English has also had time to reflect on her actions and has continuously expressed sincere remorse over the last 20 months.

For all the extraordinary considerations in this case and after a thorough consideration of the § 3553(a) factors, Ms. English respectfully requests a variance from the guideline range and a sentence of time-served (approximately 20 months' incarceration) with a period of supervised release.

## BACKGROUND

Ms. English was arrested on January 28, 2025, after alerting law enforcement at the U.S. Capitol Building that she wished to turn herself in after having fleeting and unorganized thoughts of killing Scott Bessent, which she clearly abandoned upon turning herself in.

The government initially charged her with receiving, possessing, or transferring a firearm, under 26 U.S.C. § 5861 or, carrying or discharging a firearm, dangerous weapon, explosive or incendiary device, under 40 U.S.C. § 5104(e)(1)(A). *See* ECF No. 1. However, the government later obtained an indictment charging Ms.

English with Attempt to Assassinate a Cabinet Member Nominee and Carrying a Firearm, Explosive, Or Incendiary Device on the Grounds of the Capitol. *See* ECF No. 16.

On March 26, 2026, Ms. English entered a guilty plea to a criminal Information charging her with Unlawful Receipt, Possession, and/or Transfer of a Firearm in violation of 26 U.S.C. § 5861(d) and Carrying a Firearm, Dangerous Weapon, Explosive, or Incendiary Device on the Grounds of the Capitol in violation of 40 U.S.C. § 5104(e)(1)(A).

Ms. English's sentencing guidelines should reflect a range of 37-46 months because the cross reference pursuant to § 2K2.5(c) is not applicable based upon the facts and circumstances in this case.

## ARGUMENT

### I.   Legal Standard

The Court is well aware of the Supreme Court's opinions in *Kimbrough v. United* States, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007). While courts must continue to consider the sentencing guidelines, Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).[1] As the Supreme Court

---

[1] Those factors include (a) the nature and circumstances of the offense and history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid unwanted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future

made clear in *Kimbrough* and *Gall*, the Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in 18 U.S.C. § 3553(a).

In two more summary reversals, the Court further clarified that the Guidelines cannot be used as a substitute for a sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors. *Nelson v. United States*, 555 U.S. 350 (2009); *Spears v. United States*, 555 U.S. 261 (2009). "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," the Court held in *Nelson*, 555 U.S. at 352. In other words, a sentencing court may not rely on the Sentencing Guidelines range as a default to be imposed unless a basis exists to impose a sentence inside that range. Rather, the court must weigh each of the factors and impose a sentence that constitutes the least amount of imprisonment necessary pursuant to § 3553(a).

II.     **Imposing a Variant Sentence is Sufficient, But Not Greater Than Necessary, to Comply with 18 U.S.C. § 3553(a).**

a. **Ms. English's Personal History and Characteristics**

Ms. English was born as an identical twin ███████████████████████ ████████████████████████████████████ Her twin was healthy and so was her older brother. █████████████████████████████████████

██████████████████████████████████████████████████

---

crimes and providing the defendant with needed educational and vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).



███████████████████████████████████████████

███████████████████████████████████████████

████████████████████.

  ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████.

Ms. English has also struggled with her mental health since she was a child. Before she even entered high school, she started experiencing what was formerly known as "gender identity disorder" but is now labeled as "Gender Dysphoria."[5] Of course at that time, Ms. English did not have a full understanding of what she was experiencing, but she did know that she struggled with her identity from a very young age. As a result, she was bullied by peers in school and had a strained

---

[4] https://www.cdc.gov/heart-defects/data/index.html.
[5] https://www.mayoclinic.org/diseases-conditions/gender-dysphoria/symptoms-causes/syc-20475255.

relationship with her twin brother, as well as her parents, who hold strong religious beliefs that include a disapproval of transgender identities.



At that time, Ms. English was a junior at Boston State University but had received failing grades and stopped attending. She was also estranged from her family. Ms. English stayed with her parents off and on over the years but struggled to maintain a good relationship due to disagreements surrounding her transgender identity. In these times of conflict, Ms. English was often left without a stable home. This created a cycle of poverty given that her times of employment were usually brief depending on her stability at the time.

Ms. English was also in the process of transitioning and taking endocrine gender-affirming medications. At times, this was prescribed. At other times, Ms. English would purchase hormones on the street from other transgender women. Also, around this time in 2023, Ms. English was in a relationship with an individual who committed suicide shortly before the instant arrest. They were

together for approximately two years. Ms. English placed a lot of blame on herself for her significant other's death, as they were temporarily separated at the time of her suicide. However, this separation was necessary because although they loved each other very much, her significant other's drug use had a negative impact on Ms. English, who at times was influenced to use drugs with her. The relationship became unhealthy as a result. Nonetheless, Ms. English blamed herself for leaving. Of course, Ms. English was not equipped to help her spouse, which she realizes now and has forgiven herself.

While Ms. English attended counseling with her mental health treatment provider, it was sporadic and irregular and her mental illness worsened over time, especially in light of the lack of stable family support and the loss of her spouse. She self-treated with marijuana and alcohol as a result. Marijuana transitioned into crack cocaine to cope with the death of her loved one ███████████████

███████████████

Prior to her arrest, Ms. English had found a place to stay with some friends and was still grappling with her girlfriend's death. She had just gotten a job at a pizza place and had only been working there for a couple weeks. The constant news about the current administration's anti-transgender agenda became a source of fear for Ms. English and another form of rejection. Not only did her family not support her identity, but now the country did not either. Her guilt about her significant other's death also created a misguided mission to somehow help the transgender community. Ms. English spent a lot of time messaging her transgender community,

8

but they did not realize how much Ms. English needed help. She told them they should all leave the country and they did not realize she was serious. Nobody knew how dire her mental health was during this time. Ms. English was hanging on by a thread when she came to D.C. with almost no money and a beat-up car that barely got her there. She did not know what she was going to do when she arrived, but what she did know was something had to give and that she needed help.

9



In addition, while incarcerated at CTF, Ms. English has completed the RSAT program and has taken any class that has been offered in an effort to rehabilitate. She has also participated in the Free Minds Book Club where she has made a positive impression upon the co-founder, Kelli Taylor, who describes Ms. English as a "bright, kind, and motivated individual." *See* Exhibit 6, CTF Rehabilitation.

### b. Nature and Circumstances of the Offense

Even in the midst of Ms. English's deep mental suffering and anguish, Ms. English knew she was not capable of hurting a single soul. Her actions on January 28, 2025, reflected an individual who was in desperate need of help, but who had no realistic plans or desires to hurt anyone. Even though this was a cry for help, Ms. English still acknowledges the severity of her conduct. She wrote a thoughtful letter to the Court, where she explains, "I am so sorry for the fear and pain I've caused people, especially Scott Bessent, my family, and the Phillips family." *See* Exhibit 7, Letter from Riley English. Ms. English also goes on to express her gratitude for being able to rehabilitate in the past 20 months. *Id.*

When Ms. English turned herself into the U.S. Capitol Police, she was not even brandishing the knife she had on her person or the dysfunctional "Molotov cocktails" that would never have had the capability of being ignited. Notably, Ms. English did

what we would expect anyone in her diminished condition to do, to stop and think, and take a different course.

For over an hour, Ms. English calmly walked around the Capitol building and mostly sat on a bench staring into space. Despite the government's argument, Ms. English was not realistically looking for a way to get into the Capitol building. Rather, she was thinking about how she could not possibly hurt another individual while trying to square those thoughts with her desperate need for help. Otherwise, why would it make sense to turn herself in rather than get back in her car and drive home? The only logical answer is that Ms. English came all the way from Massachusetts, after feeling and believing that her life was in shambles to the point of no return and decided to get help the only way she knew how in that moment. The step of turning herself in was her pleading for mercy from her life and acknowledging she could not move forward alone. Ms. English turning herself in was her making herself the most vulnerable a person could be to complete strangers who knew nothing about her. The evidence does not reflect that Ms. English only turned herself in because she believed she was "made," when not a single U.S. Capitol police officer was approaching her or watching her because she had given them no reason to do so.

After Ms. English was arrested, law enforcement took advantage of her diminished mental state and proceeded to interrogate her for hours without the assistance of counsel. However, in the midst of her rambling and incoherent thoughts, Ms. English again made herself clear that she would not and could not hurt another person.

11

Everyone who knows Ms. English agrees that she is a non-violent person who has never been in a situation like this before. One of her closest friends who has known her for 4 years explains, "The events that occurred that resulted in Raleigh's arrest are extremely unlike her…. I have never known Raleigh to be violent in any way…. Raleigh told me that what she did is unacceptable, and she regrets it deeply." *See* Exhibit 8, Letters of Support, Letter from Sinead Vaughan. Her close friend Phoebe Matthy also explains that Ms. English is "someone who has favored peaceful reconciliation over overt confrontation for every challenge that has come her way." *Id.*, Letter from Phoebe Matthy.

Ms. English's family all explain how remorseful she has been since this incident. *Id.* Her older brother Zack, thoughtfully explains how his sister got to this point and that "Riley has repeatedly expressed shame for her actions." *Id.*, Letter from Zack English. Ms. English's twin brother also says his twin has "repeatedly expressed remorse, regret, and a serious effort to make amends." *Id.*, Letter from Daniel English. Ms. English's parents also explain how their child has taken responsibility and never provided any excuses. *Id.*, Letter from Timothy and Lisa English.

12

███████████████████████████████████████████

█████████████████████

Lastly, Ms. English's young age is a crucial factor in this case that cannot be ignored. The Supreme Court has explained:

> [A] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young…. Even the normal 16-year old customarily lacks the maturity of an adult. It has been noted that adolescents are overrepresented statistically in virtually every category of reckless behavior…. [J]uveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. This is explained in part by the prevailing circumstances that juveniles have less control, or less experience with control, over their own environment…. [T]he character of a juvenile is not as well formed as that of an adult. The personality traits are more transitory, less fixed.

*Roper v. Simmons*, 543 U.S. 661, 570 (2005).

In addition, the Sentencing Commission has previously recognized that "[a]ge (including youth) may be relevant in determining whether a departure is warranted…." U.S.S.G. § 5H1.1 (formerly). The Commission has considered amendments that would significantly discount (or eliminate) the criminal history points that attach to youthful offenses in light of the "[s]cientific studies on brain development showing that psychosocial maturity, which involves impulse control, risk assessment, decision-making, and resistance to peer pressure, is generally not developed until the mid-20s."[6] The recently published 2025 sentencing guidelines

---

[6] U.S. Sentencing Commission, Proposed Amendments 38 (Dec. 26, 2023), *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20231221_rf-proposed.pdf; *see also id.* (considering adding language that "A downward departure also may be warranted due to the defendant's youthfulness at the time of the he U.S. Sentencing Commission in its report on

eliminated § 5H Specific Offender Characteristics but in doing so made clear that "the Commission envisioned and framed this 2025 amendment to be outcome neutral, intending that judges who would have relied upon facts identified as a basis for a downward departure would continue to have authority to rely upon such facts to impose a sentence outside the applicable guideline range as a variance under 18 U.S.C. § 3553(a).[7]" The takeaway from the Commission's findings that were based upon scientific research is that this Court should consider the fact that Ms. English was only 24 years old when she engaged in this conduct and was of course susceptible to so many influences and pressures and her ability to reason was not fully developed. Her young age is a crucial factor that should be considered when viewing the nature and circumstances of the offense.

### c.  The Need for Rehabilitation

The Bureau of Prisons (BOP) is not the place for Ms. English for a multitude of reasons. Firstly, there is no guarantee or even likelihood that Ms. English will be

---

Youthful Offenders in the Federal System also defined youthful offenders as those *"age 25 or younger* at the time they are sentenced in the federal system" in light of "recent case law and neuroscience research in which there is a growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 on average." U.S. Sentencing Commission, *Youthful Offenders in the Federal System* 1, 5 (May 2017) (emphasis added).

[7] 2025 Sentencing Guidelines Manual, Chapter 1, Subpart A, also explaining in the Introductory Commentary that "the guidelines and policy statements set forth throughout the Guidelines Manual represent the first step in the sentencing process and are one of multiple factors judges must consider under 18 U.S.C. § 3553(a)." This language acknowledges that non-guideline sentences are a normal part of the sentencing process.

housed in a women's unit within the BOP.[8] Although there is a current directive for the BOP to comply with *Kingdom v. Trump et al*, No. 25-cv-691 (RCL), there is not enough data regarding how this directive has been enforced and the directive does not apply to housing. The decision in *Kingdom* placed a preliminary injunction on an executive order from President Trump that prohibited gender-affirming medical care for transgender people in federal prisons. The government has requested a stay of this injunction pending its appeal to the D.C. Circuit. The decision on this stay is pending.

In fact, based upon the experience of another transgender defendant recently sentenced, the assumption should be that transgender women are not being housed in women's facilities. In *United States v. Ruby Corado*, No. 24-cr-266 (TNM), Ms. Corado was sentenced to 33 months' incarceration and is housed in a male unit at FCI Oakdale.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

---

[8]   https://www.prisonology.com/blog/confusion-and-anger-at-bureau-of-prisons-over-opm-memos?utm_medium=email&_hsenc=p2ANqtz-_xUVysFDsOwLjBZHBO WlP0Rn0oeM1HIn-VgN-5IIgPyjNf3ZnOjDzMTw1sNoO31mIAxcP7WBella V6Ge9juCOD_j1PhA&_hsmi=348797637&utm_content=348797637&utm_source=hs _email.

Lastly, Ms. English has already engaged in significant rehabilitation at CTF. She has availed herself of all available mental health counseling and treatment that is offered there. She has also completed a substance abuse treatment program. Because of her desire and participation in counseling and treatment, Ms. English now has a clear head to think about what she wants to do after she is released. In the past five years, she developed a passion for cooking and a dream of becoming a chef. Ms. English enjoyed learning under a great chef during her time working in Connecticut and she now wishes to pursue schooling to explore a career in culinary arts. Ms. English has submitted an application to a culinary school focused on returning citizens in the Midwest called Edwin's Culinary Institute.

### d.  Unwanted Sentencing Disparities

Ms. English's case is extraordinarily unique and for that reason there is no other case that shares a lot of similar characteristics. However, what is clear is that Ms. English should not be sentenced more severely than the below cases with more aggravating circumstances. For example, in *United States v. Laketia Hazelwood*, No. 19-cr-208 (RJL), the Court imposed a sentence of 46 months' incarceration after the defendant entered into a 43-unit apartment building and ignited a bag filled with gasoline which ultimately created a fire. The fire department was able to extinguish the fire and while nobody was hurt, multiple residents were displaced for a period of time due to the damage caused by the fire. Similarly, in *United States v. Jerritt Pace*, No. 20-cr-104 (RC), the defendant admitted to filling a plastic laundry detergent bottle with gasoline and lighting it on fire outside of the Metropolitan Police

Department. The Court imposed a sentence of 36 months' incarceration partly due to Mr. Pace's past struggles with his mental health.

In fact, this case is more akin to some of the January 6 cases where defendants brought weapons onto Capitol Grounds but were not violent. For example, in *United States v. Joshua Black*, No. 21-cr-127 (ABJ), Mr. Black was sentenced to 20 months' incarceration after admitting to bringing a knife with him into the Capitol building (and Senate room) and said, "I wanted to get inside the building so I could plead the blood of Jesus over it." Like Ms. English, Mr. Black did not brandish his knife or realistically intend to use it in any way. In contrast, in *United States v. Lonnie Coffman*, No. 21-cr-0004 (CKK), the Court imposed 46 months' incarceration for an individual who brought firearms, including an assault rifle, and components for an explosive or incendiary device in his vehicle in the vicinity of the Capitol Grounds. Unlike Mr. Coffman, Ms. English did not bring such destructive items with her but rather a knife and small bottles of alcohol that would never have operated as Molotov cocktails.

III.    **A Downward Variance Should Also Be Considered for the Same Reasons Previously considered in U.S.S.G. § 5H1.3 and 5H1.4.**

The Sentencing Commission has previously recognized that someone's physical and mental condition could be relevant in determining whether a downward departure is warranted. U.S.S.G. §§ 5H1. 3 and 5H1.4 (formerly). The recently published 2025 sentencing guidelines eliminated § 5H Specific Offender Characteristics but in doing so made clear that "the Commission envisioned and framed this 2025 amendment to be outcome neutral, intending that judges who would

17

have relied upon facts identified as a basis for a downward departure would continue to have authority to rely upon such facts to impose a sentence outside the applicable guideline range as a variance under 18 U.S.C. § 3553(a).[9]"

The Sentencing Guidelines recognize that mental and emotional conditions may be relevant in determining whether a departure is warranted is "such conditions…are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.3*; see also United States v. Rothwell*, 847 F. Supp. 2d 1048 (E.D. Tennessee March 21, 2012) (downward departed warranted based on defendant's mental capacity); *United States v. Rivera*, 192 F.3d 81 (2d Cir. 1999) (downward departure may be granted where extreme childhood abuse caused mental and emotional conditions that contributed to commission of offense).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████ Both her mental and emotional and physical conditions are significant reasons to grant a downward variance.

### IV.   The Court Should Not Apply § 2K2.5(c)

---

[9] 2025 Sentencing Guidelines Manual, Chapter 1, Subpart A, also explaining in the Introductory Commentary that "the guidelines and policy statements set forth throughout the Guidelines Manual represent the first step in the sentencing process and are one of multiple factors judges must consider under 18 U.S.C. § 3553(a)." This language acknowledges that non-guideline sentences are a normal part of the sentencing process.

The Court should decline to apply a cross reference to § 2K2.5 that only applies if the "defendant used or possessed a firearm or dangerous weapon in connection with the attempted commission of another offense." U.S.S.G. § 2K2.5(c). The government will argue that the Court should use § 2X1.1 to apply the guideline for Attempted First Degree Murder.

However, § 2X1.1 only directs courts to apply this cross reference if the "substantive offense" of attempted first degree murder is "determined to have been specifically intended or actually occurred."[10] Speculative specific offense characteristics will not be applied." U.S.S.G. § 2X1.1, n.2. The government cannot show that Ms. English specifically intended to commit first degree murder as the evidence reflects that she abandoned any unrealistic and incoherent plan and that her intent was to seek help for her diminished mental state.

Courts that have applied this cross reference have done so in cases where the evidence is clear that there was an intent to commit the offense that was vacated. For example, in *United States v. Rathjen*, 313 F. Supp. 2d 1032, 1037 (D. Neb. 2004), the defendant was actually convicted by a jury in state court for conspiracy to commit murder but this charge was later vacated on other legal grounds. The Court in

---

[10] Probation, in defending its position that the cross reference applies, cites to a Fourth Circuit case that interprets the standard as only requiring "malice aforethought" and "premeditation." *See United States v. Aberant*, 741 F. App'x 905 (4th Cir. 2018). However, this contradicts the plain reading of the guidelines that require that the offense be "specifically intended." U.S.S.G. § 2X1.1, n. 2. However, even if the Court considers the Fourth Circuit standard, for the same reasons identified in this section, Ms. English did not have the required premeditation to commit murder.

19

*Rathjen* agreed that § 2X1.1 could be applied to enhance the defendant's guidelines for a federal gun offense because that gun was obtained for the purpose of planning a murder. *Id.* The Court reviewed the same evidence the jury heard in state court and agreed that there was "reliable evidence that makes it more probable than not that the state offense was committed." *Id.* Here, we do not have a state conviction and jury finding of guilt on attempt first degree murder. It was also not more probable than not that Ms. English would have been convicted of attempt first degree murder.

In this case, unlike in *Rathjen*, the evidence does not reflect statements that were made *prior to* the alleged attempt to commit murder. Rather, after reviewing the contents of Ms. English's phone, there are no such statements or indications of a plan to kill anyone. Then, on the day of the alleged attempt, Ms. English does not make a substantial step towards the completion of the offense of murder. *See Untied States v. Hite*, 769 F.3d 1154, 1162 (D.C. Cir. 2014) (general meaning of 'attempt' in federal criminal law was an action constituting a 'substantial step' towards commission of a crime and performed with the requisite criminal intent). The D.C. Circuit in *Hite*, in further analyzing what a substantial step was, looked to Black's Law Dictionary to explain that "the defendant was guilty of attempt when he intended to cause such a result and 'di[d] or omit[ted] to do anything with the purpose of causing or with the belief that it [would] cause such a result without further conduct on his part." *Id.* (quoting Black's Law Dictionary (6th ed. 1990)).

The Court here cannot find that Ms. English took a substantial step towards the commission of first-degree murder because her clear actions of turning herself in

20

made it so that her *mens rea* indicated she did not want the result of murder to occur. Ms. English also did not brandish or use the knife or fake Molotov cocktails on her person. *See e.g. United States v. Duran*, 96 F.3d 1495, 1507 (D.C. Cir. 1996) (substantial step proven when Duran made numerous statements in writing prior to traveling to D.C. and firing rounds from his rifle at the White House gate).

The government's argument here rests entirely on statements that Ms. English made *after* she turned herself in and that were made while she was in a diminished mental state and without counsel. The statements that Ms. English made contradict each other and do not support a plan to commit murder. For example, one of the first things Ms. English says in her recorded interrogation is "I don't know what I want to say 'cause I'll believe and feel one thing now, and I'll say and feel another thing a minute from now." Exhibit A, Video Interrogation at 6:42:32.[11] Many of Ms. English's answers during this interrogation were not coherent, some indicating she was listening to voices or a presence. For example, she said "it was really a battle between me and the [schiz] or fate or God or whatever of…. I hear you, I'm listening to you, I'm following you, I have faith but can we please not hurt anybody." *Id.* at 8:27:52. Ms. English went on to give long monologues throughout the interrogation, touching on everything from family to television to fascism, indicating a confused and unwell mind. ██████ ████████████████████████████████████████████

████████████████████████████████████████████

---

[11] This exhibit was previously provided to the Court through USAfx.

Most notably, Ms. English made statements in this interrogation that indicated she had no intent or *mens rea* to commit the crime of murder. In the statement of offense, many of these statements are outlined. For example, she told police "I didn't have a plan in my mind," and then repeated later, "When you ask me what my plans were today, I really did not have any." She then went on to talk about Luigi Mangione and said she "pushed that away" because "I was thinking like that is so stupid, that accomplishes nothing." Ms. English then explained that she thought all of it was a test to see if she would do the right thing and she indicated she passed the test by not hurting anyone and that she did the right thing. *See* Statement of Offense at 7. Then ultimately, when asked if she would have followed through with the plan even if security (in her mind) had not seen her, she said the following: "No, I think I would have continued to communicate with myself." *Id.*

Therefore, not only did Ms. English abandon any incoherent and unrealistic thoughts of hurting someone by turning herself in, but she also continuously disavowed to law enforcement that she would have committed the offense of murder after being interrogated. For these reasons, the Court should not apply this cross reference and should find that the appropriate guideline range is 37-46 months.

**<u>Conclusion</u>**

For these reasons, Ms. English respectfully requests that the Court impose a sentence of no more than 20 months' incarceration, a sentence of time served.

22

If the Court is considering a period of further incarceration, Ms. English respectfully requests that the Court recommend that she is designated to a women's medical facility.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Maria N. Jacob
Diane Shrewsbury
Assistant Federal Public Defenders
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Maria_jacob@fd.org
Diane_Shrewsbury@fd.org